**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SELVON M. WALDRON,<br>*Plaintiff*,<br>v.<br>GENESYS WORKS,<br>*Defendant*. | Civil Action No. 25-3852 (SLS)<br>Judge Sparkle L. Sooknanan |

## MEMORANDUM OPINION

In 2025, Genesys Works (GW), a youth career development nonprofit, terminated Selvon Waldron from his position as Executive Director of one of its sites. Mr. Waldron sued GW under the District of Columbia Human Rights Act (DCHRA), alleging that his termination, an earlier negative evaluation, and a performance improvement plan were all the result of retaliation and racial discrimination. GW counters that it took those actions because of Mr. Waldron's substantial and ongoing performance failures—including hundreds of thousands of dollars in losses at his site—and his unwillingness to work toward improvement. On the record before the Court, no reasonable jury could conclude that GW's non-retaliatory and non-discriminatory reasons for its actions were pretextual. As a result, the Court grants summary judgment to GW.

## BACKGROUND

### A. Factual Background

The Court draws the facts from the Parties' Statements of Material Facts and the underlying materials referenced in those statements. *See* Joint Statement of Undisputed Material Facts (JSOF), ECF No. 34; Def.'s Statement of Undisputed Facts ¶¶ 1–42, ECF No. 28; Pl.'s Statement of Undisputed Material Facts (PSOF), ECF No. 31-1; Def.'s Reply to PSOF, ECF No. 32-1. The

Court assumes the facts in those statements to be true unless they have been specifically disputed, and it assumes the truth of other undisputed statements in the record. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[1]

GW is a non-profit organization that provides career support for low-income high school students, primarily by placing students in paid internships with corporate partners. JSOF ¶ 1. GW operates through two types of regional entities—(1) independent 501(c)(3) organizations managed by local boards, and (2) "integrated sites" managed directly by GW's national leadership. JSOF ¶ 2. As of September 2024, GW had five integrated sites across the country. *Id.* The National Capital Region (NCR) site operates in the greater District of Columbia area. *Id.* NCR has operated as an integrated site since 2018, when GW's national organization absorbed NCR due to the site's financial troubles. JSOF ¶ 6.

In 2021, Mr. Waldron began serving as the Executive Director of NCR. Waldron Dep. at 23:11–22, Pl.'s Ex. 1, ECF No. 31-2. Jeffrey Artis, GW's CEO, helped hire Mr. Waldron. JSOF ¶¶ 4–5. Mr. Waldron reported to Tom Knight, GW's Managing Director of Site Operations, who supervised the Executive Directors of all five integrated sites. JSOF ¶ 8. Mr. Waldron and Mr. Artis are Black, and Mr. Knight is white. JSOF ¶¶ 4, 7; Waldron Dep. at 19:11.

Mr. Waldron's tenure as Executive Director seemed to start on the right track. During 2021, NCR achieved a profit, and Mr. Waldron received an "Exceeds Expectations" rating on his annual evaluation. JSOF ¶ 10. But his evaluation noted areas for improvement, including the need to place interns earlier in the academic year, to maximize internships, and to focus on time management. *Id.* And in the following years, NCR's financial performance dipped. The site lost $293,356 in

[1] Local Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

2022, $457,929 in 2023, and $201,012 in 2024. JSOF ¶ 11; Knight Decl. ¶ 22, Def.'s Ex. 1, ECF No. 28-1. Mr. Waldron's performance evaluations suffered in turn. For 2022, Mr. Waldron received a "Meets Expectations" rating, with his review noting similar areas for improvement as his prior review. JSOF ¶ 10. Then for the 2023 evaluation cycle, Mr. Waldron received a "Needs Improvement" rating. JSOF ¶ 12; Knight Decl. ¶ 9, Att. 3. In his review, Mr. Knight provided feedback on his financial expectations and goals, while noting that "NCR [wa]s a turnaround project" and that Mr. Waldron had made "significant strides in improving NCR[.]" JSOF ¶ 12. A white Executive Director of a different integrated site received the same rating in 2023. JSOF ¶ 13.

In March 2024, Mr. Waldron submitted a complaint to GW's Board of Directors, claiming that he received the "Needs Improvement" rating in retaliation for various complaints he had raised the prior year. JSOF ¶ 14. GW's Board retained an outside attorney, Linda Woeber, to investigate Mr. Waldron's complaint. JSOF ¶ 15. As part of her investigation, Ms. Woeber reviewed Mr. Waldron's numerous complaints to GW's Human Resources department, including:

> that multiple members of the National Leadership Team ignored his contributions during executive meetings; that several members of the National Leadership Team acknowledged others for contributions Mr. Waldron had made; that leaders refused to engage with Mr. Waldron to repair what he viewed as troubled relationships; that his initial salary in 2021 had been set lower than that of a colleague that he deemed to be a comparator; that Jeff Artis failed to meet with Mr. Waldron to discuss a Predictive Index . . . Assessment; and several other grievances that Mr. Waldron termed "micro-aggressions."

Woeber Decl. ¶ 5, ECF No. 28-4; JSOF ¶ 16; Latarewicz Decl. ¶ 2–3, ECF No. 28-2. Ms. Woeber interviewed 19 witnesses and "solicited and considered supporting documentation" from Mr. Waldron and others. JSOF ¶ 17. Mr. Waldron shared that although he did "not know what [was] causing [the treatment that he complained about] in full," he suspected that his race was at least part of it. Mem. From Linda L. Woeber to Bd. of Dirs. (July 9, 2024) (First Woeber Report) at 17, Ex. A to Woeber Decl., ECF No. 28-4. And he later testified that portions of his complaints

involved "personal experiences of being treated differently as regards [to his] race." Waldron Dep. at 66:11–15.

Ms. Woeber ultimately issued a report in July 2024 concluding: Mr. Waldron's "Needs Improvement rating . . . does not appear to be causally related to [his] race or complaints about disparate treatment. The financial condition of NCR is a solid objective basis for the . . . rating and [Mr. Waldron's] white male peer received the same rating for the same reason in 2023." JSOF ¶ 18. Her report also noted that although multiple Executive Directors had raised issues related to GW's organizational culture, the organization's national leadership team was seeking to address these issues, including through discussions facilitated by consultants. JSOF ¶ 20.

During the summer of 2024, Mr. Knight had discussions with Mr. Artis and the GW Board of Directors regarding whether to issue Performance Improvement Plans (PIPs) to Mr. Waldron and to the Executive Director of the New York City site, a white male. JSOF ¶¶ 21–22. Mr. Knight recommended issuing PIPs to both Executive Directors, even though PIPs were not required by GW policy and both employees were employed at will. JSOF ¶ 22. In September 2024, GW issued a PIP to the Executive Director of the New York City site because of lagging financial performance metrics and unprofessional yelling. JSOF ¶ 21. Six days later, GW issued a PIP to Mr. Waldron. *Id.* Mr. Waldron's PIP primarily identified concerns related to financial performance, including intern retention, on-time placements, year-over-year growth, and grant coordination. JSOF ¶ 23. The PIP also established measurable goals for (1) on-time intern starts, (2) intern utilization and retention, (3) year-over-year growth of the intern cohort, (4) contributed income, and (5) expense management. JSOF ¶ 24. Mr. Waldron declined to sign the PIP. JSOF ¶ 28. According to Mr. Waldron, some of the goals were unattainable within the expected timeline. JSOF ¶ 24. For example, the PIP required Mr. Waldron to place 100% of the NCR interns in positions by October

11, 2024, which was only 29 days from the date of the PIP; only two of eight regional sites had achieved that goal by January of the prior year. *Id.*

On September 13, 2024—the day after receiving his PIP—Mr. Waldron filed a second complaint with the GW Board of Directors, alleging that GW had issued the PIP in retaliation for his March 2024 complaint. JSOF ¶ 26. This complaint also raised other allegations of retaliation, including that Mr. Knight had contacted Mr. Waldron with work-related questions while he was on vacation. Mem. From Linda L. Woeber to Bd. of Dirs. (Nov. 25, 2024) (Second Woeber Report) at 3–5, 11–12, Ex. B to Woeber Decl., ECF No. 28-4. GW again engaged Ms. Woeber to investigate, JSOF ¶ 27, and she concluded that Mr. Waldron's PIP was "grounded in measurable metrics and objective criteria[,]" Second Woeber Report at 16.

At this point, Mr. Knight and Mr. Waldron were meeting on a weekly basis. JSOF ¶ 29. In January 2025, Mr. Knight compiled an update on Mr. Waldron's PIP performance, which noted shortcomings on multiple PIP goals. JSOF ¶ 30; Knight Decl. ¶ 19, Att. 9. And in April 2025, Mr. Knight prepared a full summary of Mr. Waldron's progress, reflecting that while NCR had largely met its utilization and retention goals, it continued to lag on the PIP goals for on-time intern starts, year-over-year growth, expense management, and contributed income. JSOF ¶ 32; Knight Decl. ¶ 20, Att. 10 at 4–5. Mr. Knight offered to extend the PIP beyond the original seven-month period, but did not receive a response from Mr. Waldron. JSOF ¶ 35. Mr. Waldron acknowledges that he did not meet the PIP goals during that planned seven-month period. JSOF ¶ 33.

In May 2025, GW terminated Mr. Waldron's employment. JSOF ¶ 36. Stephanie Latarewicz, GW's Senior Director of Human Resources, recommended termination, and Mr. Artis and Mr. Knight agreed. *Id.* Mr. Artis then shared the recommendation with the GW National Board, and the Board sought legal advice in making its determination. *Id.* Mr. Waldron received

notice of his termination on May 29, 2025. *Id.* He declined to sign a Severance and Release Agreement. *Id.* Mr. Waldron's replacements as interim Executive Director and permanent Executive Director were both Black women. JSOF ¶ 37.

**B. Procedural Background**

In September 2025, Mr. Waldron filed his lawsuit in the Superior Court of the District of Columbia, alleging retaliation and racial discrimination under the DCHRA. *See* Compl. ¶¶ 57–72, ECF No. 1-1. GW then removed the case to this Court based on diversity jurisdiction. *See* Notice of Removal, ECF No. 1. Following discovery, GW moved for summary judgment. Def.'s Mot. (Mot.), ECF No. 28. This motion is fully briefed and ripe for review. *See* Pl.'s Opp'n (Opp'n), ECF No. 31; Def.'s Reply (Reply), ECF No. 32.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). To defeat summary judgment, the nonmovant must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (cleaned up). In considering a motion for summary judgment, a court "may not make credibility determinations or otherwise weigh the evidence." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016). Instead, it must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* Summary judgment is appropriate only if, viewing the evidence in that light, the court concludes that no reasonable jury could find for the nonmovant. *Steele v. Mattis*, 899 F.3d 943, 947 (D.C. Cir. 2018).

## DISCUSSION

GW asks the Court to grant summary judgment in its favor on Mr. Waldron's DCHRA retaliation and race discrimination claims. The Court agrees that summary judgment is warranted. On the record before the Court, no reasonable jury could conclude that GW's proffered non-retaliatory and non-discriminatory reasons for Mr. Waldron's termination were pretextual.

### A. Statutory Background

The DCHRA prohibits employers in Washington, D.C. from discriminating against individuals based on race in hiring, firing, compensation, or other terms and conditions of employment. *See* D.C. Code § 2–1402.11(a). The DCHRA also prohibits employers from retaliating against an employee "on account of having exercised or enjoyed . . . any right granted or protected under this chapter." *Id.* § 2–1402.61(a). "Discrimination and retaliation claims brought under the DCHRA are analyzed in the same manner as such claims arising under Title VII." *Ndondji v. InterPark Inc.*, 768 F Supp. 2d 263, 286 (D.D.C. 2011). Therefore, the Title VII framework may be used as "a short-hand reference" when analyzing claims under the DCHRA. *Johnson v. Dong Moon Joo*, No. 01-cv-0004, 2006 WL 627154, at *19 (D.D.C. Mar. 12, 2006).

Title VII "[d]iscrimination and retaliation claims are subject to the familiar, burden-shifting framework" from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). Throughout this process, the ultimate burden of persuasion remains with the plaintiff. *See Jackson v. Gonzales*, 496 F.3d 703, 706 (D.C. Cir. 2007). For starters, absent direct evidence of discrimination, a plaintiff must establish a prima facie case by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802. "To state a prima facie case of discrimination, a plaintiff must allege she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Walker*, 798 F.3d at 1091. Meanwhile, "[f]or a retaliation claim, the plaintiff must

allege that she engaged in activity protected by Title VII, the employer took adverse action against her, and the employer took that action because of the employee's protected conduct." *Id.* at 1091–92. If a plaintiff establishes a prima facie case, "the burden shifts to the employer to identify the legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action." *Id.* at 1092. If the employer meets this burden, the prima facie case becomes irrelevant. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). Instead, "the 'central question' at summary judgment becomes whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee.'" *Walker*, 798 F.3d at 1092 (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)). "If the Court answers that question in the affirmative, the employee survives summary judgment." *Regis v. Mullin*, No. 24-cv-2405, 2026 WL 2137987, at *4 (D.D.C. July 24, 2026).

A plaintiff may rely on different types of evidence to support an inference that the employer's stated reasons for an adverse employment action were pretextual. *See Walker*, 798 F.3d at 1092. For example, the plaintiff may "cit[e] the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Id.* (citing *Brady*, 520 F.3d at 495 n.3). But "[s]howing pretext requires more than simply criticizing the employer's decision-making process." *Wilson v. Noem*, No. 20-cv-100, 2025 WL 1000666, at *15 (D.D.C. Apr. 3, 2025); *see also Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (explaining that a

court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive" (cleaned up)).

### B. Retaliation

Mr. Waldron argues that GW retaliated against him by: (1) giving him a "Needs Improvement" rating in his 2023 performance evaluation, (2) placing him on a PIP in September 2024, and (3) terminating him in May 2025. The Court will evaluate each action in turn.[2]

#### 1. 2023 Performance Evaluation

First, Mr. Waldron argues that a reasonable jury could find that GW retaliated against him through his 2023 "Needs Improvement" performance rating. The Court disagrees.

Because GW identifies a legitimate, nonretaliatory explanation for the evaluation, the Court will skip the "unnecessary sideshow" of whether Mr. Waldron has proven a prima facie case of retaliation. *See Brady*, 520 F.3d at 494; *Jeffries v. Barr*, 965 F.3d 843, 860 (D.C. Cir. 2020) (applying the *Brady* standard to a retaliation claim). In defending Mr. Waldron's evaluation, GW points to NCR's "persistent financial failures"—specifically, the site's large financial losses and lagging performance metrics. Mot. at 26; *see also* JSOF ¶ 11 (detailing a $293,356 loss in 2022 and a $457,929 loss in 2023). Undoubtedly, an executive director's poor financial performance, as evidenced by steep losses at their site, is a legitimate, non-retaliatory explanation for a low performance evaluation. *Cf. Cooper v. District of Columbia*, 279 F. Supp. 3d 156, 168 (D.D.C.

---

[2] GW argues that many of the acts detailed in Mr. Waldron's Complaint are time-barred. Mot. at 23 (discussing Mr. Waldron's allegations "that the consideration of his application for employment in 2021 had been slowed by Mr. Artis," "that his pay in 2021 had been different than his peers," that he was being treated differently, and that Mr. Artis made certain comments to him and interrupted him). But Mr. Waldron is not asserting claims for these discrete acts. And nothing stops him from using them "as 'background evidence' to contextualize [his] timely claim." *Alberti v. District of Columbia*, No. 24-cv-3219, 2026 WL 369623, at *7 (D.D.C. Feb. 10, 2026) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

2017) ("It is well established that an employee's poor job performance is a nondiscriminatory justification for an adverse employment action." (quotations omitted)); *Robertson v. Dodaro*, 767 F. Supp. 2d 185, 191 (D.D.C. 2011) ("The defendant's dissatisfaction with the plaintiff's performance establishes a legitimate, non-discriminatory reason for the plaintiff's performance ratings."). Thus, this claim turns on whether Mr. Waldron has produced sufficient evidence for a reasonable jury to discard GW's asserted reason as pretextual and find that GW retaliated against him in response to protected activity. *See Brady*, 520 F.3d at 494; *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).

Mr. Waldron makes two attempts to prove pretext, neither of which carries the day. *First*, he claims that his 2023 performance rating, which GW issued in February 2024, was the "first opportunity" to retaliate against him after his August 2023 complaints about differential treatment. Opp'n at 14. Specifically, he points to a meeting in August 2023 where he spoke to his "personal experiences of being treated differently as regards [to his] race" by national leaders like Mr. Artis and emphasized GW's "need for unconscious bias and intercultural competency training." *Id.* (quoting Waldron Dep. at 66:11–15; 68:13–15).[3] But Mr. Waldron cites no evidence whatsoever linking his August 2023 complaint to his performance review, which occurred six months later. *See Adewole v. PSI Servs., Inc.*, 798 F. Supp. 2d 57, 65 (D.D.C. 2011) (holding that "[w]ithout more, a gap of six months between the plaintiff's protected activity and the challenged action is simply too long to create an inference of retaliation"). Moreover, the record reveals that GW actively worked to resolve the organizational culture issues that Mr. Waldron raised. *See, e.g.*,

---

[3] Contrary to GW's argument, *see* Mot. at 25, the Court is satisfied that this complaint qualifies as protected activity under the DCHRA. *See Slate v. Pub. Def. Serv. for the District of Columbia*, 31 F. Supp. 3d 277, 292 (D.D.C. 2014) ("[P]rotected activity encompasses utilizing informal grievance procedures such as complaining to management or human resources about the discriminatory conduct.").

JSOF ¶ 20 (describing GW's efforts to facilitate better dialogue); Waldron Dep. at 113:4–19 (acknowledging that GW provided an unconscious bias training as requested); First Woeber Report at 10–13 (explaining GW's responsiveness to Mr. Waldron's concerns). Therefore, no reasonable jury could conclude that GW was somehow "lying in wait" to punish Mr. Waldron through a negative performance review. Opp'n at 14. At summary judgment, such speculation does not create a genuine issue of material fact.

*Second*, Mr. Waldron claims that GW's proffered explanation for his poor 2023 performance rating must have been pretext because NCR's performance metrics were similar in 2021, 2022, and 2023. Opp'n at 14–15. The record does not support Mr. Waldron's claim. To the contrary, it is undisputed that NCR's losses rose considerably, from $293,356 in 2022 to $457,929 in 2023. JSOF ¶ 11. And Mr. Waldron acknowledges that he was aware of the importance of financial stability of his site and the need to improve his performance. *See* Waldron Dep. at 170:16-18 (acknowledging that the 2023 performance evaluation was not the first time he had heard of NCR's financial issues); Knight Decl. ¶ 9, Att. 3 at 9 (explaining in the performance evaluation that "[t]here are multiple ingredients, *as we have discussed*" to closing the gap on NCR's sustainability) (emphasis added). So this argument, too, fails to undermine GW's non-retaliatory explanation for Mr. Waldron's 2023 performance evaluation.

**2. PIP**

Next, Mr. Waldron argues that GW retaliated against him by placing him on a PIP in September 2024. Opp'n at 7–10. Again, GW has identified a legitimate, non-retaliatory reason for the PIP: NCR's performance continued declining throughout 2024. The PIP itself explained that "NCR had failed to meet financial objectives and that substantial net losses were expected for the 2024 calendar year." JSOF ¶ 23; *see also Crowley v. Perdue*, 318 F. Supp. 3d 277, 288 (D.D.C.

2018) (explaining that poor performance is a legitimate, non-retaliatory reason for initiating a PIP). Therefore, Mr. Waldron must produce sufficient evidence for a reasonable jury to find that GW's asserted reason was pretextual and that GW issued the PIP in response to protected activity.[4] *See Brady*, 520 F.3d at 494; *Jones*, 557 F.3d at 678. Mr. Waldron has not met his burden.

*First*, Mr. Waldron points out that the Executive Director of the Bay Area site was not placed on a PIP even though that site's performance metrics trailed NCR. Opp'n at 9. Evidence that similarly situated employees who did not engage in protected activity were treated "more favorably in the same factual circumstances" may support an inference that the employer acted unlawfully. *Brady*, 520 F.3d at 495. To raise that inference, however, the plaintiff must "demonstrate that 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [other]' employee." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting *Neuren v. Adduci, Mastriani, Meeks & Shill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995)). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015). Here, the Bay Area site's Executive Director is not an adequate comparator. At the outset, it does not appear that the Bay Area site performed worse than NCR. *See* Knight Decl., ¶ 22, Att. 16; Waldron Dep. 190:8–192:8. But putting that aside, the site's Executive Director voluntarily resigned from GW in June 2024, months *before* Mr. Waldron received his PIP in September. *See* Second Knight Dep. at 53:20–22, 54:12–18, Def.'s Ex. E, ECF No. 28-3. So GW had no occasion to issue a PIP to that individual.

[4] GW does not dispute that Mr. Waldron's March 2024 complaint to the GW Board of Directors constitutes predicate protected activity. *See* Mot. at 26.

*Second*, Mr. Waldron argues that the PIP set unrealistic standards designed to ensure that he would fail, which is evidence of pretext. *See* Opp'n at 10–12. For example, he claims that it "would have made more sense" to implement the PIP on a different timeline to account for the school calendar. Opp'n at 11. However, "[o]nce the employer has articulated a non-[retaliatory] explanation for its action . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Harris v. Noem*, No. 1:21-cv-01083, 2025 WL 915701, at *22 (D.D.C. Mar. 26, 2025) (alterations in original) (quoting *Fischbach*, 86 F.3d at 1183); *see also Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (explaining that it is not a court's role to act as "a super-personnel department that reexamines an entity's business decisions" (citation omitted)). Here, perhaps Mr. Waldron's alternative proposals would have made more sense under the circumstances. But he has marshaled no evidence that GW did not honestly believe that the PIP sought to adequately measure his performance. *See Ey v. Off. of Chief Admin. Officer of U.S. House of Representatives*, 967 F. Supp. 2d 337, 344 (D.D.C. 2013) ("[T]he plaintiff's own disagreement with his supervisors' view is certainly not sufficient to establish pretext[.]"). In fact, the record demonstrates that GW went to great lengths to justify how and why it established the PIP. *See, e.g.*, Knight Decl. ¶ 12 (explaining that Mr. Knight prepared Mr. Waldron's PIP "through a meticulous process . . . to set goals that [Mr. Knight] believed were objective, attainable, and squarely within [Mr. Waldron's] control"); First Knight Dep. at 190:14–191:7, Pl.'s Ex. 2, ECF No. 31-2 (explaining why GW introduced the PIP when it did); *id.* at 200:2–201:7 (explaining why Mr. Knight thought fundraising goals were achievable); *id.* at 233:3–11 (explaining why Mr. Knight thought intern placement goals were achievable); *see also Brady*, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for

permitting a jury to conclude that the employer is lying about the underlying facts."). And Mr. Knight even offered to work with Mr. Waldron to improve NCR's metrics *beyond* the initial PIP evaluation period, which undermines Mr. Waldron's assertion that GW issued an unrealistic PIP to ensure that he would fail. JSOF ¶ 35. Again, Mr. Waldron has not identified evidence on which a reasonable jury could conclude that GW's legitimate non-retaliatory reasons for placing him on the PIP were pretextual.

**3. Termination**

Finally, Mr. Waldron argues that GW retaliated against him by terminating his employment in May 2025. Yet again, the Court finds that no reasonable jury could reach this conclusion on the current record.

Mr. Waldron first argues that he has rare direct evidence that GW terminated him in retaliation for his prior complaints. *See* Opp'n at 6–7. While direct evidence is uncommon, it can undoubtedly be used to prove retaliation. *See Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015). Here, Mr. Waldron claims that he found a smoking gun buried in hundreds of pages of deposition transcripts. He says that Mr. Artis conceded in his deposition that he began considering termination only after Mr. Waldron's second discrimination complaint in September 2024.[5] *See* Opp'n at 6–7. But this is a disingenuous account of Mr. Artis's deposition testimony. For sure, Mr. Artis may have been displeased about Mr. Waldron's complaint, *see* Artis Dep. at 273:5–12, Pl's Ex. 4, ECF No. 31-2, but he clarified that "the conversations about termination arose when it became clear" that Mr. Waldron was "obstinate about his unwillingness to meet—to adhere to the goals and . . . strategic direction of the organization," *id.* at 274:3–12. And this justification aligns with GW's

[5] Mr. Waldron refers to this second complaint as the "October 2024 complaint." Opp'n at 6. However, the Court understands this discussion to refer to the September 13, 2024, complaint to GW's Board of Directors. JSOF ¶ 26.

legitimate explanation that it terminated Mr. Waldron because he showed an unwillingness to improve NCR's performance metrics and the consistent testimony of multiple members of GW's leadership. *See* Latarewicz Dep. at 156:6–157:10, Pl's Ex. 3, ECF No. 31-2; First Knight Dep. at 287:8–288:1; Second Knight Dep. at 38:2–20. When viewed in context, no reasonable jury could find that a stray quote from Mr. Artis's deposition constitutes sufficient direct evidence that GW terminated Mr. Waldron in retaliation for his complaint.

Mr. Waldron must thus return to circumstantial evidence to prove that his termination was retaliatory. Again, GW has established legitimate, non-retaliatory reasons for Mr. Waldron's termination: the substantial and ongoing performance failures at NCR and Mr. Waldron's unwillingness to work towards improvement. *See* Mot. at 26–32; Reply at 8–10; *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (noting that "performance below the employer's legitimate expectations" is a "legitimate reason[] for discharge"); *Chowdhury v. Schafer*, 587 F. Supp. 2d 257, 264 (D.D.C. 2008) (explaining that failure to meet a PIP is a legitimate reason to terminate an employee). So Mr. Waldron must establish pretext to survive summary judgment. He attempts to do so in four ways, all of which are insufficient.

*First*, Mr. Waldron points to comparator evidence, arguing that GW did not terminate the Executive Director of the New York site despite that site's worse performance metrics.[6] *See* Opp'n at 9–10. But on this record, the New York site's Executive Director is not an adequate comparator.

---

[6] Mr. Waldron also vaguely gestures to other sites' Executive Directors as potential comparators. *See* Opp'n at 9–10. However, he goes no further to explain why "all of the relevant aspects of [his] employment situation were nearly identical to" the Executive Directors at the three remaining integrated sites. *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (quotation omitted). And the record reveals that he may not be able to make that showing given differences among GW's sites. *See* Second Knight Dep. at 53:12–54:18 (explaining that the other underperforming integrated sites were distinguishable due to age, involvement from the GW national team, or recent resignations).

It is true that both Mr. Waldron and the New York Executive Director received PIPs in September 2024. But unlike Mr. Waldron, the New York Executive Director actively collaborated with GW leadership on the PIP requirements and largely improved his performance. *See* First Knight Dep. at 214:2–11, 242:9–12. That alone dispels Mr. Waldron's contention. Mr. Waldron disagrees, claiming that he also attempted to engage "in an interactive process through a response letter." Opp'n at 10. As with many of Mr. Waldron's arguments, the record does not bear that out. Mr. Waldron sent this response letter weeks after receiving the PIP, mainly to argue that it set unreasonable goals at an inappropriate time, *see* Knight Decl. ¶ 15, Att. 8; he never signed the PIP, JSOF ¶ 28; and he admitted he did not meet most of the goals outlined in the PIP, JSOF ¶¶ 30, 32–34. As a result, Mr. Waldron has not met the high bar of identifying an adequate comparator to establish pretext at summary judgment.[7]

*Second*, Mr. Waldron contends that GW terminated him before he could meet the expectations of the PIP, thus establishing pretext. He argues that NCR "continued to close the gap" on other sites throughout 2025, Opp'n at 12, and that it was "subjective" to punish him for failing to meet enrollment metrics at certain times, Opp'n at 14. But again, Mr. Waldron's claim that he was set up to fail is belied by the record. In "[e]valuating an employer's asserted reason for a discharge," the Court must "ask not whether the employer was objectively correct in discharging the employee but instead whether 'the employer honestly believes in the reasons it offers.'" *Ball v. George Washington Univ.*, 798 F. App'x 654, 655 (D.C. Cir. 2020) (citing *Fischbach*, 86 F.3d at 1183). Here, Mr. Waldron points to nothing but his subjective belief that GW did not honestly believe that NCR's performance continued to deteriorate. *See Robertson v. Dodaro,* 767

[7] Curiously, elsewhere in his briefing, Mr. Waldron attempts to *distinguish* the New York Executive Director as a comparator, arguing that he was placed on a PIP due to unprofessional conduct that Mr. Waldron did not exhibit. *See* Opp'n at 10.

F. Supp. 2d 185, 192 (D.D.C.2011) (explaining that "an employee's subjective assessment of her own performance is insufficient to establish" pretext). And the record contradicts Mr. Waldron's subjective belief. His PIP stated that he could be terminated if he did not meet its specific goals—and he acknowledges that NCR did not, in fact, meet those goals. JSOF ¶ 33; *see also* Knight Decl. ¶ 13, Att. 6; JSOF ¶ 30, 32–34. Even further, nothing obligated GW to issue a PIP before terminating Mr. Waldron in the first place. JSOF ¶ 22. And GW offered to work with him to improve his performance even beyond the initial PIP period—an offer to which he did not timely respond. JSOF ¶ 35. On this record, no reasonable jury could find that GW set Mr. Waldron up to fail or doubt the veracity of GW's asserted belief that his performance warranted termination.

*Third*, Mr. Waldron argues that shoddy investigations into his two complaints led to his termination. Recall that GW hired an independent investigator, Linda Woeber, to investigate Mr. Waldron's March and September 2024 discrimination complaints. JSOF ¶¶ 14–15, 17, 26. Mr. Waldron argues that Ms. Woeber's reports were flawed, contradictory, and arguably preordained. *See* Opp'n at 15–17. A materially flawed investigation can support an inference of pretext. *Burley*, 801 F.3d at 296–99. But not here. To start, Ms. Woeber's reports are entirely irrelevant, since nothing in them contributed to Mr. Waldron's termination. Rather, as GW has consistently explained, it terminated him because of his substantial and ongoing performance failures at NCR and his unwillingness to work towards improvement. *See* Mot. at 26–32; Reply at 8–9. But even if Ms. Woeber's reports played some role in Mr. Waldron's termination, he does not establish that her investigations were "so unsystematic and incomplete" that they prove pretext. *Burley*, 801 F.3d at 296. Mr. Waldron does no more than speculatively nitpick at perceived contradictions in Ms. Woeber's reports, Opp'n at 15–17—reports that are notably transparent and comprehensive, JSOF ¶ 17 (explaining that Ms. Woeber "interviewed nineteen witnesses and

solicited and considered supporting documentation provided by [Mr. Waldron] and other interviewees"). Moreover, errors in an investigative report do not, without more, establish pretext, because an employer may act on a "reasonable belief in the validity of the reason given even though that reason may turn out to be false." *George*, 407 F.3d at 415. And Mr. Waldron never even attempts to show that GW lacked a "reasonable belief" in the veracity of Ms. Woeber's reports. *Id.* As a result, the undisputed evidence does not permit a reasonable inference that Ms. Woeber's investigations establish pretext.

*Fourth*, grasping at straws, Mr. Waldron claims pretext on the basis that GW offered an inconsistent post hoc explanation for his termination: his pursuit of a doctoral degree while employed at GW. Opp'n at 18 (citing Mot. at 30 n.25). It is true that "a plaintiff can meet his burden of proving pretext with evidence that 'the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision.'" *Francis v. District of Columbia*, 731 F. Supp. 2d 56, 72 (D.D.C. 2010) (citing *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). But that did not happen here. GW never claimed that it terminated Mr. Waldron because of his academic pursuits. GW mentioned that fact only in a footnote in briefing saying that it might explain Mr. Waldron's performance failures at NCR. *See* Mot. at 30 n.25 (stating that "it is certainly possible" that Mr. Waldron's performance failures can be linked to his doctorate program). Therefore, this evidence is neither relevant nor probative of pretext.[8]

* * *

[8] Mr. Waldron filed a Motion in Limine to exclude evidence of his doctoral program. Pl.'s Mot. in Limine, ECF No. 27; *see also* Def.'s Opp'n, ECF No. 29; Pl.'s Reply, ECF No. 30. Although the Court considers Mr. Waldron's doctoral program to the extent necessary to address *his own* arguments, GW's summary judgment motion independently prevails. Therefore, the Court denies Mr. Waldron's motion as moot.

Having examined Mr. Waldron's arguments individually, the Court now asks whether all the evidence "in combination provide[s] sufficient evidence for a reasonable jury to infer retaliation." *Jones*, 557 F.3d at 679 (cleaned up). It does not. GW has proffered legitimate, non-retaliatory explanations for Mr. Waldron's performance rating, his PIP, and his termination. Indeed, the record makes clear that before GW terminated Mr. Waldron, it spent well over a year identifying NCR's shortcomings and attempting to work with him to improve his performance. Even when viewing the evidence in Mr. Waldron's favor, no reasonable jury could find pretext for retaliation. GW is therefore entitled to summary judgment on Mr. Waldron's retaliation claim.

### C. Discrimination

Next is Mr. Waldron's discrimination claim, which is easily dispensed with. Mr. Waldron appears to argue that GW discriminated against him through the same three incidents as his retaliation claim.[9] As with his retaliation claim, given GW's legitimate, non-discriminatory reasons for these adverse actions, the Court skips to whether he has "produced evidence sufficient for a reasonable jury to find that [GW's] stated reason was not the actual reason and that [GW] intentionally discriminated against [him] based on his race." *Brady*, 520 F.3d at 495. To prove such pretext, Mr. Waldron may rely on the same categories of evidence as he did for his retaliation claim. *See Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 257 (D.D.C. 2017).

Though his briefing is far from clear, Mr. Waldron appears to invoke three pieces of evidence to prove pretext. *First*, he again attempts to compare himself to other Executive Directors who were treated differently. *See* Opp'n at 9–10, 21. But this argument falls flat for the same reason it did before—Mr. Waldron cannot show that "all of the relevant aspects of [his]

[9] GW argues that that the "performance evaluation[] and PIP are [] not cognizable adverse actions" that may give rise to a discrimination claim under the DCHRA. Mot. at 33 n.27. The Court need not reach that argument given its conclusion that Mr. Waldron fails to establish pretext.

employment situation were nearly identical to" the putative comparators. *Neuren*, 43 F.3d at 1514 (cleaned up).

*Second*, Mr. Waldron tries to show that his termination was because of his race, not his poor performance, because NCR's metrics were improving. *See Fischbach*, 86 F.3d at 1183 (explaining that "[e]vidence indicating that an employer misjudged an employee's performance" can at least be "relevant" to showing pretext). But once again, Mr. Waldron's "subjective assessment of [his] own performance is insufficient" to survive summary judgment, *Robertson*, 767 F. Supp. 2d at 192, particularly given the undisputed fact that he failed to meet the goals set out in his PIP, JSOF ¶¶ 33–34.

*Third*, Mr. Waldron claims that Mr. Artis exhibited "racially insensitive behavior towards [Mr.] Waldron and [an] overall hostility towards DEI" that "raises an inference of discrimination[.]" Opp'n at 23. For example, Mr. Waldron cites certain "microaggression[s]"—*i.e.*, Mr. Artis using Mr. Waldron as a "negative example when discussing race or hypothetical scenarios[.]" *Id.* Setting aside the fact that these allegations appear to rest exclusively on his own deposition testimony—and that Mr. Artis himself is Black—Mr. Waldron makes no effort to connect Mr. Artis's alleged racial biases to the adverse employment actions at issue.

For all these reasons, Mr. Waldron has not identified sufficient evidence to create a material dispute on the ultimate issue of discrimination—"either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affs. v. Burdine*,

450 U.S. 248, 256 (1981). The Court therefore grants GW's motion for summary judgment on Mr. Waldron's discrimination claim.[10]

## CONCLUSION

For the foregoing reasons, the Court grants GW's motion for summary judgment, ECF No. 28, and denies Mr. Waldron's Motion in Limine, ECF No. 27, as moot.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: November 2, 2026

[10] GW also argued that Mr. Waldron cannot establish a hostile work environment claim. Mot. 37–41. But Mr. Waldron never pleaded a hostile work environment claim and does not rely on that theory in opposing summary judgment.